IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANNY MAY STEVENS,

                            Plaintiff,                           CV-05-1790-ST

           v.                                        FINDINGS AND
                                                      RECOMMENDATION

MAX WILLIAMS; STAN CZERIAK; BETTY
BLAYLOCK; JOAN PALMATEER; JIM
MARAS; JEAN HILL; BILL DOWMAN; G.
STUART; and M.D. MILHORN,

                              Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Anny May Stevens ("Stevens"), appearing *pro se*, is a pre-operative male-to-

female transsexual[1] prisoner at the Snake River Correctional Institution ("SRCI"), a correctional

institution in Ontario, Oregon, which houses male inmates and is operated by the Oregon

---

[1] A transsexual is "one who has '[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex' and who typically seeks medial treatment, including hormonal therapy and surgery, to bring about a sex change." *Farmer v. Brennan*, 511 US 825, 829 (1994) (citations omitted).

Department of Corrections ("ODOC").  The Complaint alleges three claims pursuant to 42 USC

§ 1983 against a number of state officials and employees who work at SRCI or ODOC:[2]  Max

Williams, ODOC Director; Stan Czeriak, ODOC Assistant Director of Operations; Joan

Palmateer, ODOC Institution Division Administrator; Jean Hill, SRCI Superintendent; Bill

Dowman, SRCI Supervising Executive Assistant; Betty Blaylock, ODOC (title unknown); Jim

Maras, ODOC Program Manager for Transfer and Classification Unit; Steve Shelton, M.D.,

Medical Director for ODOC Health Services; Larry L. Herring, ODOC Health Services

Administrator; Steve Franky, SRCI Assistant Superintendent; G. Stuart, SRCI Superintendent's

Office; Al Hannan, SRCI Institution Security Manager; Mike Milhorn, SRCI Correctional

Captain; Jennifer Bjerke, Oregon State Penitentiary ("OSP") Security Manager; Captain

Peterson, SRCI Segregation Captain; Robert Real, SRCI Correctional Captain; Ricky King,

SRCI Correctional Sergeant; Katrinda Reyes, SRCI Correctional Officer; T. Hicks, SRCI

Rule/Procedures/Policies and Grievance/Minority Affairs; S. Hodge, RN, SRCI Health Service

Manager; G. Atkins, SRCI Mental Health Manger; Mrs. Henning, SRCI Mental Health

Counselor; T. Blankenbaker, SRCI Institutional Counselor; G. Sharp, SRCI Intensive

Management Unit Counselor; Rebecca Rouillard, SRCI Correction Library Coordinator; Ms.

Husk, SRCI Mail Room; C. Roberts, SRCI Business Office; and K. Perry, SRCI Records.

In his first claim, Stevens complains that ODOC has discriminated against him[3] on the

basis of gender by failing to place him in a correctional facility housing female inmates and to

___

[2] Although the Complaint lists only the nine defendants listed in the caption, the attachments to the Complaint list many other additional defendants.

[3] Although Stevens prefers to be referred to by female pronouns, this court will use male pronouns in order to conform to, and not create confusion with, the documents in the record.

refer to him with female titles and female pronouns ("Claim One").  Complaint, pp. 3-4.  The second claim alleges that defendants have denied Stevens necessary medical treatment for his transsexualism, including failure to provide counseling for transsexualism, grant his requests for hormone therapy, and grant him sexual reassignment surgery ("Claim Two").  *Id* at 4.  The third and final claim asserts that defendants have denied Stevens protective custody despite threats of violence received from inmates at SRCI ("Claim Three").  *Id* at 4-5.  He believes that each of these acts violates the Eighth and Fourteenth Amendments of the United States Constitution, Article I, Sections 16 and 20 of the Oregon Constitution, and Articles 1 through 7 of the United Nations Universal Declaration of Human Rights.  As a result, Stevens requests damages of $5,000,000, and injunctive relief ordering defendants to:  (1) recognize him as a female; (2) reinstate hormone therapy; (3) provide him with sexual reassignment surgery; (4) provide counseling for transsexualism; and (5) protect him from any and all future violence, rape or death.  Steven also requests "if [at] all possible [,] my release from prison."  *Id* at 5.

Defendants now move for summary judgment against each of Stevens' claims (docket # 33).  For the reasons that follow, defendants' motion should be granted and judgment entered in favor of defendants.

///

///

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.

## FACTS

### I.    Medical Treatment

Stevens was admitted to ODOC custody on September 8, 1997, to serve a 220 month sentence for Manslaughter in the First Degree. Complaint, Exhibit Part 4, pp. 18-19. He alleges that he was sentenced as a woman to a correctional institution housing females, but ODOC placed him into an institution housing males because he remains anatomically a male.

On November 22, 1994, Stevens received a legal name change (from Edward to Anny May) and gender change (from male to female) in Multnomah County Circuit Court. *Id*, Exhibit Part 4, p. 15. Prior to entering prison, Stevens had a history of mental health problems, as well

4 - FINDINGS AND RECOMMENDATION

as difficulties with drugs and alcohol.  Plaintiff's Exhibit 5, pp. 1-12.  Medical records submitted

by Stevens show that he was treated at various times for major depression, gender identity

disorder, and alcohol dependence.  *Id.*  As part of his treatment Stevens had received hormone

therapy beginning in 1994.  *Id*; Defendants' Exhibit 101 ("Shelton Aff."), Attachment No. 5, p.

4.  He continued this therapy through the time he was housed at the county jail awaiting the final

disposition of his criminal case.  Shelton Aff., Attachment No. 2, pp. 2-6.

     At his initial medical screening, Stevens told medical staff that he identifies as a female

and had been taking Premarin, a female hormone replacement, before his incarceration.  *Id* at 8

& Attachment 2, p. 6.  Stevens was seen by mental health care professionals upon his transfer

from intake to OSP.  *Id* at ¶ 8 & Attachment No. 5, pp. 1-6.  They noted that Stevens had

suffered for years from depression, had reported multiple suicide attempts, had been hospitalized

10 times over the prior five year period, had a history of alcohol and drug problems, and was

diagnosed with major depression and borderline personality disorder.  *Id.*

     On October 2, 1997, Stevens saw former ODOC staff physician Robert Ingle, M.D., to

discuss his transgender issues and medication concerns.  *Id* at ¶ 9 & Attachment No. 2, p. 9.

Stevens agreed with Dr. Ingle that Premarin was not being used to treat a disease.  *Id.*  Dr. Ingle

opined that neither Premarin nor sexual reassignment surgery were medically indicated and

advised Stevens that Premarin would not be prescribed.  *Id.*  According to Dr. Ingle, "[g]ender

identity disorder is a psychiatric condition which is associated with significant emotional

distress; however, there is no data that castration and sexual change surgery is associated with

any emotional improvement. . . . Patients unhappy with their biologic sex are usually just as

unhappy after a sex change operation."  *Id.*

Over the next 42 months, Stevens was seen by health services professionals in both OSP and SRCI and was treated for a variety of complaints. *Id* at ¶ 10 & Attachment No. 2, pp. 9-27. ODOC mental health care professionals frequently diagnosed Stevens with depression, borderline personality disorder, dysthymia, polysubstance abuse, and gender identity disorder. *Id* at 7-50. During this time Stevens continued to express interest in hormone treatment and a sex change and in being identified as a female, although at times he expressed some measure of conflict between his sexual identity and religious beliefs. *Id* at 7, 12, 17, 19, 24, 29, 34, 37, 47, 48, 50, 51.

On June 1, 2001, former SRCI staff physician Ian Duncan, D.O., met with Stevens at SRCI upon his transfer from OSP. *Id* at ¶ 11 & Attachment No. 2, p. 28. Stevens expressed his desire to take Premarin. *Id*. Dr. Duncan met with Stevens again on June 17, 2001, to discuss the result of tests done at the first meeting. *Id*. Stevens again requested surgery and hormone treatment. *Id*. Dr. Duncan agreed to present this request to the Therapeutic Level of Care Committee ("TLCC") in accordance with the ODOC Health Services Policy. *Id*.

ODOC Health Services Policy and Procedure #P-A-02.1 establishes four levels of medical care and treatment for inmates. *Id* at ¶ 4 & Attachment No. 1. Mandatory care (Level 1) is "essential to life and health, without which rapid deterioration may be an expected outcome." *Id* at 2. Necessary Care (Level 2) is care without which the inmate suffers "significant risk of either further serious deterioration of the condition or significant reduction of the chance of possible repair after release or [] significant pain or discomfort." *Id* at 3. Acceptable but Not Necessary Care (Level 3) is care "for non-fatal conditions where treatment may improve the quality of life for the patient." *Id* at 4. Any procedure falling into Level 3 is

subject to individual clinical review by the TLCC, which determines whether the treatment will be provided by examining factors such as "[t]he urgency of the procedure and the length of the inmate's remaining sentence stay," and "[a]ny relevant functional disability and the degree of functional improvement to be gained." *Id* at 5. Finally, care of Limited Medical Value (Level 4) is "significantly less likely to be cost-effective or to produce substantial longterm gain," and is generally not authorized by the ODOC. *Id* at 6.

According to Steve Shelton, M.D., ODOC's Director of Health Services, ODOC has no medical policy addressing gender reassignment as a special entity separate from all other medical conditions. *Id* at ¶ 5. Rather, the policy categorizes gender identity disorder ("GID") and gender reassignment as a Level 3 or 4 condition which must be assessed by the TLCC on an individual basis according to the Level 3 care provision. *Id*. The TLCC considers a number of factors when determining whether to authorize elective care in general. *Id*. When a patient requests a "continuation" of gender reassignment, consideration is given to the extent of the patient's prior evaluations and work-ups; the completeness, findings, and expertise of prior evaluations; the extent of any prior reassignment; the patient's prior and current adjustments; and expected length of stay with ODOC. *Id* at ¶ 6. According to Dr. Shelton, a patient who has had a full evaluation and is under treatment from a GID program and has shown significant mental health or medical health improvement has a good case to present before the TLCC for continuation of treatment. *Id* at ¶ 7. Conversely, "strong consideration will be given by ODOC to the lack of consistent evidence in controlled studies of accurate medical diagnostic criteria, lack of consistent evidence of improvement of patients with reassignment, and the lack of deterioration of health without reassignment." *Id* at ¶ 6.

7 - FINDINGS AND RECOMMENDATION

On July 17, 2001, a TLCC comprised of Dr. Shelton and three other physicians met to discuss Stevens' request for transgender changes. *Id* at ¶ 12; Complaint, Exhibit Part 5, p. 11. According to Dr. Shelton, "[a]fter careful consideration, TLCC concluded that the requested procedure and course of treatment was not medically necessary to either preserve [Stevens'] physical health, nor as a needed adjunct to mental health treatment." Shelton Aff., ¶ 12 & Attachment No. 4, p. 1.

Dr. Duncan informed Stevens of the TLCC's decision on August 17, 2001. *Id* at ¶ 13 & Attachment No. 2, p. 29. Dr. Duncan noted Stevens' disappointment and "clarified that neither sex-change surgery nor hormonal treatment would be likely to occur during his period of incarceration." *Id*. He encouraged Stevens to "shift his plans to the period of time following his incarceration." *Id*.

On July 31, 2001, prior to learning of the TLCC's decision, Stevens filed a grievance seeking reinstatement of hormone treatment, gender reassignment surgery and the provision of women's undergarments. *Id*, Attachment No. 6, pp. 1-11. C. Ryals, the Health Services Manager at SRCI, responded on August 26, 2001, that the procedure he requested was "not considered medically necessary." *Id* at 12. Stevens appealed. *Id* at 13. Dr. Shelton responded that "the procedure that you request is not a serious medical need and is considered entirely elective. [ODOC] Health Services will not provide or support this request." *Id* at 17.

Over the next two years after the TLCC's determination, mental health care staff continued to be available to Stevens and saw him frequently. *Id* at ¶ 16 & Attachment No. 5, pp. 51-60.

On March 7, 2002, Stevens filed a Petition for Writ of Habeas Corpus in state court. Defendants' Exhibit 103.   The Petition recounts Stevens' history of transsexualism, including his diagnosis in 1994, his name/gender change, his treatment including hormone therapy through a community health care provider, and continued hormone therapy while housed in the county jail awaiting the disposition of his criminal case.  *Id* at 2-3.  It also recounts Stevens' continuous efforts to receive treatment for his transsexualism, including hormone therapy and surgery, while in ODOC's custody.  *Id* at 3-6.  Stevens complained that he has been denied treatment for transsexualism which is a "serious medical need" and that this denial constitutes "deliberate indifference" to his serious medical needs in violation of his constitutional rights.  *Id* at 6.  The state court denied Stevens' Petition by entering a Judgment on September 3, 2002.  Defendants' Exhibit 104.

On May 31, 2003, an SRCI security staff member contacted health services to report that Stevens had vocalized a desire to remove his own testes.  Shelton Aff., ¶ 15 & Attachment No. 2, pp. 34-35.  Medical staff met with Stevens, assessed him as having a low risk of immediate self harm, and referred him to Correctional Treatment Services for continued care.  *Id*.  After this event, Stevens expressed on several occasions his desire for treatment for his sexual identity issues and for performing surgery on himself.  *Id*,  Attachment No. 5, pp. 57, 61.

In an undated letter, apparently in response to a letter from Stevens to the Federal Bureau of Prisons, Dr. Shelton again denied Stevens' request for hormone treatment, gender reassignment, and female undergarments.  Complaint, Exhibit Part 6, p. 21.  Dr. Shelton stated that in reaching his decision, he reviewed the treatment Stevens received during the periods both

before and after his incarceration, including the treatment he received from community health

care providers who were providing Stevens with hormone treatment. *Id.*

On May 6, 2004, Stevens sent an Inmate Communications Form ("kite") to "Ms.

Hennen" requesting "urgent counseling" for transsexualism and gender dysphoria. Complaint,

Exhibit Part 6, p. 26. Mrs. Henning responded that "we do not do counseling for this." *Id.* One

day later, Stevens sent a kite to "Ms. Atkins" asking if anyone was qualified to treat an inmate

for transsexualism and whether he was or had ever received treatment for transsexualism or

gender dysphoria. *Id* at 28. Mrs. Henning responded to the kite, stating that "you are not being

treated for this disorder - I am unaware if you have ever been treated for this disorder." *Id.*

On August 2, 2005, Stevens had an appointment with SRCI staff physician Garth Gulick,

M.D., and reported no new issues with respect to his sexual orientation being changed. Shelton

Aff., ¶ 17 & Attachment No. 2, p. 52. He expressed remorse over his past and said he felt

trapped. *Id.* Dr. Gulick noted that gender reassignment would not be feasible "without mental

health assessment and clearance." *Id.*

When Dr. Gulick saw Stevens again on October 4, 2005, Stevens wanted to have his

testicles removed and resume taking female hormones. *Id* at ¶ 18 & Attachment 2, p. 53. Dr.

Gulick referred this request to the TLCC which concluded that neither gender reassignment

surgery nor female hormone therapy was medically necessary for Stevens. *Id* at ¶ 18 &

Attachment No. 4, p. 10.

A few weeks later, Stevens told a mental health care provider, T. J. Footen, that based

upon his own research, he had transsexualism disorder. *Id*, Attachment No. 5, p. 75. Footen told

Stevens that they do not provide treatment for that disorder. *Id.* On November 9, 2005, Stevens

complained to Footen of increased depression, ineffective medications, and loss of contact with his family and issues related to his gender identity. *Id* at 76. Footen instructed Stevens that Footen's treatment of Stevens was not focused on transsexualism, "but rather on his symptoms of depression and family adjustment issues." *Id*.

A week later, Stevens tried again to turn the focus of his treatment with Footen to transsexualism, which Footen rebuffed. *Id*. Footen changed Stevens' diagnosis from dysthymia to major depression based upon his deteriorating condition. *Id*. Mental health staff at SRCI continued to see Stevens on a regular basis throughout 2005 and into 2006, the most recent records submitted. *Id* at 76-87. Notably, Stevens' depression seems to have improved in early 2006. *Id* at 86-87

In Dr. Shelton's opinion, "ODOC properly has declined to provide plaintiff with a sex-change operation and/or female hormones because neither surgery nor hormonal replacement treatment is medically indicated." *Id* at ¶ 19. He admits that "at times, there may be a difference of opinion between the patient and the physicians as to how best to treat [Stevens'] condition," but ODOC Health Services "are aware of [Stevens'] medical and mental health needs, and "will continue to monitor [Stevens'] medical mental health care needs and remain available to him" for treatment. *Id* at 20, 21. Medical and mental health services are delivered to inmates independently and without interference from ODOC security and administrative staff. *Id* at ¶ 22. Thus, "security and administrative staff have no leverage or influence as to what medical and mental health services are provided to inmates." *Id*.

## II.    Gender Issues and Discrimination

11 - FINDINGS AND RECOMMENDATION

Upon his initial placement into OSP, Stevens indicated that he felt "rotten" and discriminated against by being placed into a male prison.  Shelton Aff., Attachment No. 5, p. 12.

On September 25 and October 22, 2003, Stevens sent kites to "Ms. Hicks" inquiring whether it was appropriate for a staff member to  discriminate against an inmate because of their sexual orientation or status as a transsexual.  Complaint, Exhibit Part 5, pp. 20-21.  T. Hicks responded that it was not appropriate and suggested several options to Stevens for handling suspected discrimination.  *Id*.

In early 2004, Stevens made multiple requests by kite and grievance to be referred to as a female using female pronouns and titles.  *Id*, Exhibit Part 6, pp. 1-23.   Additionally, Stevens requested that all of his paperwork and prison file be changed to reflect his proper gender and requested that he be transferred to an institution housing females.  *Id* at 2-13.  Several officials at ODOC responded to Stevens' requests.

On February 23, 2004, Jim Maras, Program Manager for the Classification and Transfer Unit ("Maras"), acknowledged Stevens' request to be referred to as a female and responded that according to ODOC records, Stevens was a male, and "[a]s such, being housed in a male facility, it would be inappropriate for staff to address you as a female. . . . Your situation and legal status, not your desire, will dictate how staff interact with you."  *Id* at 15.

On March 1, 2004, Joan Palmateer, ODOC Institution Division Administrator ("Palmateer"), responded to Stevens' letter to ODOC Director, Max Williams ("Williams").  *Id* at 16.  Recognizing that Stevens had received a legal name/gender change, she wrote:

> I understand your personal feelings can be that of a female and that you
> have gone to court for a name/gender change.  However, since you are still
> a male, anatomically, the department will continue to consider and treat

> you as a male inmate.  As such you will be referred to as either inmate
> Stevens or Mr. Stevens.

*Id.*

Palmateer also denied Stevens' request to be transferred to a female institution, and

indicated that if he felt unsafe from other inmates due to his "transsexual condition," he should

contact security staff or his counselor and request protective custody.  *Id*.  She concluded:

> I am denying your request to be addressed as Ms., or any other female
> title.  I am sure you must recognize that the more you call attention to this
> matter, the more difficult it becomes for you to live in harmony with other
> male inmates.  If you feel unsafe, please advise staff so they may address
> those issue [sic].
>
> I consider this matter closed.

*Id*.

Stevens received a similar letter from Larry L. Herring, ODOC Health Services

Administrator ("Herring"), on March 11, 2004.  *Id* at 18.  Herring acknowledged receipt of the

court documents concerning Stevens' gender change, but advised Stevens that this does not

change how he will be referred to as an inmate:

> While I understand your frustration, unfortunately, you were sentenced
> and incarcerated as a male.  Until such time that the court makes further
> determination as to your gender status, you will continue to be recognized
> by your court assigned name and gender.

*Id*.

On March 31, 2004, Bill Dowman, writing for Superintendent Hill, denied Stevens'

continued requests to be referred to as a female.  *Id* at 22.

Stevens filed a grievance against all of these officials on April 5, 2004.  *Id* at 23-24.  In

response, Lt. Sherbondy, Administrative Lieutenant for SRCI, again denied Stevens' request to

be referred to as a female, receive gender reassignment surgery, and be transferred to a facility that would address his transsexualism. *Id*, Exhibit Part 8, p. 21.

Stevens sent another kite to Superintendent Hill on July 31, 2005, referencing the earlier denials by Palmateer, and Dowman, and requesting again that his institutional files be changed to refer to him as female. *Id*, Exhibit Part 8, p. 5. Dowman again denied the request. *Id* at 6.

Further efforts by Stevens on each of these issues have continued to be unfruitful. *See* Stevens Aff. (docket # 28).

## III.    <u>Efforts to Protect Stevens from Physical Harm</u>

After his conviction, Stevens was initially placed into the Administrative Segregation Unit ("ASU") at OSP due to his feminine appearance. Shelton Aff., Attachment No. 5, p. 1. In June 2000, ODOC transferred Stevens to SRCI. *Id* at 28. Stevens reported to mental health professionals at SRCI on a number of occasions that he felt harassed and threatened by other inmates. *Id* at 28, 33, 34-35, 37, 46, 50, 66, 81, 84-87 & Attachment No. 2, p. 12.

In June 2005, while housed in the Intensive Management Unit ("IMU") at SRCI, Stevens submitted several kites indicating he had been threatened with physical harm and death. Complaint, Exhibit Part 7, pp. 4-11; Defendants' Exhibit 102 ("Cain Aff."), Attachment No. 2, p. 1. In each one, Stevens requested a transfer to OSP. On June 22, 2005, Correctional Sergeant C. Miller interviewed Stevens. Cain Aff., ¶ 10 & Attachment No. 2. Stevens gave Sergeant Miller the names of a number of inmates who allegedly were threatening him and requested a transfer to OSP or the ASU. *Id*. Sergeant Miller noted that some of the names given to him by Stevens referred to individuals who were never housed in the same unit at the same time as Stevens or no longer housed at SRCI. *Id*.

On July 1, 2005, Superintendent Hill denied Stevens' request to be housed in the ASU. Complaint, Exhibit Part 7, p. 12. This was in part due to the fact that Stevens was currently in the IMU due to an attempted assault on a staff member, and the IMU was a "considerably more restrictive and, thus, more protective" housing environment. *Id*.

On July 14, 2005, the Special Needs Inmate Evaluation Committee ("SCIEC") reviewed Stevens' concerns and his request. Cain Aff, ¶ 11 & Attachment No. 2, p. 4. The SCIEC found that Stevens could not be safely housed at OSP at that time because he had conflicts with individuals housed there. *Id*. It also concluded that Stevens did not meet the criteria for placement in the ASU and instructed him to report any threats he received upon his return to the general population after his release from the IMU. *Id*.

On February 26, 2006, Sergeant James Taylor interviewed Stevens about his continued desire to be placed in the ASU. *Id* at ¶ 11 & Attachment No. 2, p. 5. Stevens had no additional information to add to his request and would not provide any names or the nature of any problems. *Id*. Taylor noted that Stevens had no documented conflict with inmates at SRCI. *Id*. The SCIEC again denied his request at its next meeting. *Id* at ¶ 12.

ODOC policy on administrative segregation (*i.e.*, protective custody), codified at OAR 291-046-0005 through OAR 291-046-0091, provides the procedures for separating and segregating inmates "who constitute a continuing and/or immediate threat to the safety, security, and orderly operation of the facility; or require protective custody." *Id* at ¶ 3 & Attachment No. 1. According to Brad Cain, Security Manager at SRCI ("Cain"), "an inmate is placed in administrative segregation when security staff and administration decide that the inmate should not have contact with inmates in general population . . . for a number of reasons." *Id.* One

reason an inmate may request commitment to the ASU is for protective custody. *Id* at ¶ 5.

However, he must reveal to ODOC officials the identity of the person or persons he claims to

fear because otherwise ODOC officials may place the inmate in the same housing unit or cell

with one of his predators. *Id* at ¶ 7.

Cain states that "ODOC officials give requests for protective custody the serious

attention they deserve and act swiftly to offer protection to inmates who face threats from other

inmates for any valid reason." *Id* at ¶ 8. He also states that SRCI security staff have given

Stevens ample opportunity to be separated from any aggressors that may exist. *Id* at ¶ 13. In his

opinion, "SRCI takes threats against personal safety seriously and does not hesitate to provide

protective custody if it determines that threats against an inmate's personal safety are real. Mr.

Stevens' personal safety has remained intact." *Id*.

Stevens has submitted no evidence that he has ever been subjected to physical violence

due to ODOC's failure to place him into protective custody.

## FINDINGS

### I.    State and International Law Claims

In support of his claims, Stevens invokes 42 USC § 1983 ("§ 1983"). However, § 1983

provides a remedy only for "the deprivation of any rights, privileges, or immunities secured by

the Constitution and laws" of the federal government. It provides no remedy for violations of

state law. *Hydrick v. Hunter*, 500 F3d 978, 987 (9th Cir 2007), *petition for cert filed* (US Jan 17,

2008) (No. 07-958); *Ybarra v. Bastian*, 647 F2d 891, 892 (9th Cir 1981), *cert denied*, 454 US 857

(1981).

Stevens also relies on the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948).  That document "does not of its own force impose obligations as a matter of international law."  *Sosa v. Alvarez-Machain*, 542 US 692, 734 (2004).  Thus, it does not create any rights secured by federal law that could give rise to an action under § 1983.  *See Flores v. S. Peru Copper Corp.*, 414 F3d 233, 259 (2nd Cir 2003) (holding that Universal Declaration of Human Rights was not binding on the United States and, therefore, could not give rise to an environmental claim); *Guaylupo-Moya v. Gonzales*, 423 F3d 121, 133 (2nd Cir 2005) (noting that Universal Declaration of Human Rights does not have the effect of domestic law and does not provide independent, privately enforceable rights).

Therefore, summary judgment should be granted to the extent that Stevens' claims are based on violations of state law or the Universal Declaration of Human Rights.

## II.    <u>Collateral Estoppel - Claim Two</u>

Defendants assert that Claim Two alleging a lack of adequate medical care is barred by collateral estoppel due to Stevens' previously unsuccessful state habeas claim made on the same basis.  Collateral estoppel, alternatively known as issue preclusion, prevents relitigation of "all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding against the party who seeks to relitigate the issues."  *Hawkins v. Risley*, 984 F2d 321, 325 (9th Cir 1993), quoting *Robi v. Five Platters, Inc.*, 838 F2d 318, 322 (9th Cir 1988).  Federal courts generally give preclusive effect to issues decided by state courts.  *Allen v. McCurry*, 449 US 91, 95-96 (1980).  As explained by the Supreme Court, such preclusive effect derives from the common law, policies supporting collateral estoppel and 28 USC § 1738 which provides that the

"judicial proceedings [of any State] . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . ." *Id.*

Thus, the Ninth Circuit has held that a decision rendered on an issue actually litigated in state habeas proceedings may not later support a § 1983 claim where the state habeas proceeding "afforded a full and fair opportunity for the issue to be heard and determined under federal standards." *Silverton v. Dep't of Treasury*, 644 F2d 1341, 1347 (9th Cir 1981), *cert denied*, 454 US 895 (1981). This is true even though the relief available in § 1983 cases is different than that available in habeas proceedings. *Id.* The Ninth Circuit cautioned, however, that "[t]he existence of a full and fair hearing on constitutional claims under federal standards is the keystone of the unclimbable wall protecting the finality of a prior state habeas adjudication. In its absence, that wall crumbles." *Id* at 1346; *see also, Sperl v. Deukmejian*, 642 F2d 1154 (9th Cir 1981) (holding that where claim of prosecutorial misconduct was tried and rejected in state habeas corpus proceedings, the doctrine of collateral estoppel precluded reconsideration of the issue in a federal civil rights case even where federal habeas was not available).

Because federal courts must give state court judgments the same preclusive effect as given by the state courts, state law applies to determine the preclusive effect of a state habeas judgment. *See Palomar Mobile-home Park Ass'n v. City of San Marcos*, 989 F2d 362, 364 (9th Cir 1993). In Oregon, the application of issue preclusion is determined by the use of the five so-called *Nelson* factors:

> 1. The issue in the two proceedings is identical.
> 2. The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.
> 3. The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

> 4. The party sought to be precluded was a party or was in privity
> with a party to the prior proceeding.
> 5. The prior proceeding was the type of proceeding to which this
> court will give preclusive effect.

*Nelson v. Emerald People's Util. Dist.*, 318 Or 99, 104, 862 P2d 1293, 1296-97 (1994) (citations omitted).

The party asserting issue preclusion bears the burden of proof on *Nelson* factors one, two and four. *Barackman v. Anderson*, 214 Or App 660, 666-67, 167 P3d 994, 999 (2007), citing *State Farm Fire & Cas. Co. v. Century Home Components, Inc.*, 275 Or 97, 104-05, 550 P2d 1185, 1188-89 (1976) ("*Century Home*"); *State Farm Fire and Cas. Co. v. Paget*, 123 Or App 558, 562-63, 860 P2d 864 (1993), *review denied*, 319 Or 36, 876 P2d 782 (1994). To meet that burden, the party must, "[place] into evidence the prior judgment and sufficient portions of the record, including the pleading, exhibits, and reporter's transcript of the testimony and proceedings, to enable the court to reach that conclusion [that issue preclusion applies] with the requisite degree of certainty." *Century Home*, 275 Or at 104, 550 P2d at 1188; *see also Shannon v. Moffett*, 43 Or App 723, 727 n2, 604 P2d 407, 409 n2 (1979) ("Ordinarily the party asserting collateral estoppel must produce sufficient portions of the record of the prior proceeding to show what was actually decided . . . because a judgment of a court, standing alone, rarely indicates what issues were actually decided."), *review denied*, 288 Or 701 (1980).

By providing sufficient evidence to "establish that an identical issue was actually decided" in an earlier case, the party asserting issue preclusion has demonstrated a *prima facie* case. *Century Home*, 275 Or at 105, 604 P2d at 1189. "The burden then shifts to the party against whom estoppel is sought to bring to the court's attention circumstances indicating the

absence of a full and fair opportunity to contest the issue in the first action or other

considerations which would make the application of preclusion unfair." *Id*.

Oregon courts have identified a number of exceptions to the doctrine of issue preclusion.

For example, "the existence of newly discovered or crucial evidence that was not available to the

litigant at the first trial would provide a basis for denying preclusion where it appears the

evidence would have a significant effect on the outcome." *Id*, 275 Or at 108-09, 550 P2d at 1191

(citations omitted).  The Oregon Supreme Court has also cited the exceptions listed in

Restatements (Second) of Judgments, § 28, as illustrative of other circumstances where the rule

may be avoided.  *Drew v. EBI Companies*, 310 Or 134, 139, 795 P2d 531, 535 (1990).

Defendants have submitted a Petition for Writ of Habeas Corpus filed by Stevens against

the SRCI Superintendent in Malheur County Circuit Court on March 7, 2002.  Defendants'

Exhibit 103.  They have also submitted the Judgment in that case which states that the matter

came before the court on August 20, 2002, for hearing on a motion to dismiss.  Defendants'

Exhibit 104.  This Judgment denies Stevens' Petition by checking the box next to the words

"denied based upon the following findings and conclusions[.]"  *Id* at 1.  However, the Judgment

contains no such findings or conclusions.  The Judgment also has a checked box stating that it is

given in favor of the defendant "for the reasons stated on the record."  *Id* at 3.  Defendants have

not provided a transcript of this record.  The record also fails to reveal whether Stevens appealed

the Judgment.

In his state habeas Petition, Stevens alleges that he is being denied treatment for the

serious medical need of transsexualism.  Defendants' Exhibit 103, pp. 6-7.  Stevens asserts that

this denial constitutes deliberate indifference, citing *White v. Farrier*, 849 F2d 322, 325 (8th Cir

1988) and *Meriwether v. Faulkner*, 821 F2d 408, 414 (7th Cir 1987), *cert denied*, 484 US 935

(1987). *Id* at 7. Both of these cases hold that an inmate's transsexualism is a serious medical

need to which prison officials may not be deliberately indifferent without violating the Eighth

Amendment. *White*, 849 F2d at 325; *Meriwether*, 821 F2d at 413. Furthermore, the Petition

relates Stevens' efforts through July 31, 2001, to receive treatment for his transsexualism,

including the provision of female hormone treatment and sexual reassignment surgery.

      The records submitted by defendants satisfy the first, second and fourth *Nelson* factors.

The issue before this court is exactly the same issue as presented to the Malheur County Circuit

Court, namely whether prison officials were deliberately indifferent towards Stevens' legitimate

medical needs in violation of the Eighth Amendment by failing to provide him with adequate

treatment for his transsexualism. Despite the lack of findings or a transcript of the record, the

Petition and Judgment reveal that this issue was actually litigated and necessary to the state

court's decision whether to grant habeas relief. Indeed, Stevens' Eighth Amendment right to

adequate treatment for his serious medical needs was the only issue before the state court. It is

also apparent that Stevens, the party against whom preclusion is asserted in this case, was a party

to that habeas proceeding.

      The burden then switches to Stevens to demonstrate that he did not have a full and fair

opportunity to litigate the claim, or, in the alternative, that the prior proceeding was one to which

Oregon courts should not give preclusive effect. Also encompassed in this last *Nelson* factor are

"other considerations which would make the application of preclusion unfair." *Barackman*, 214

Or App at 668, 167 Or App at 999, citing *State v. Donovan*, 305 Or 332, 334-35, 751 P2d 1109,

1110 (1988).

Stevens apparently takes issue with the third *Nelson* factor by arguing that it is questionable whether the court has fairly considered the merits of an issue when it dismisses a case with prejudice but without any opinion. However, Stevens provides no evidence that he was denied an opportunity fully and fairly to litigate his claim in state court or that the state court proceedings were faulty in any way. Absent any evidence to the contrary, this court cannot presume that the state habeas proceedings were not fully and fairly litigated.

Stevens also has failed to demonstrate that it would be unfair to give preclusive effect to the state court Judgment due to the discovery of new, material evidence or due to some other applicable exception. In his state habeas Petition, Stevens asserts essentially the same facts and law as he asserts here. The only additional facts are those which developed subsequent to filing his state habeas Petition. These facts demonstrate Stevens' continued unsuccessful efforts to receive the treatment he felt he needed. The record reveals that Stevens has received the same medical services, including treatment for dysthymia, major depression, and substance abuse, throughout the entire period relevant to this motion. Thus, this court can discern no newly discovered evidence that was not available when Stevens filed his initial state habeas Petition.[4]

As a result, Stevens is precluded from relitigating his Eighth Amendment claim for deliberate indifference to his serious medical needs.

## II.    No Constitutional Violations

---

[4] In this respect, *Thompson v. Armenakis*, 161 Or App 136, 139, 984 P2d 320, 321 (1999), can be distinguished. *Thompson* found that by alleging facts that developed during and after his initial petition for habeas relief, the prisoner's subsequent habeas petition was not precluded. As a result, "[t]he claims were not previously asserted and could not have been asserted in the first petition." *Id.* However, the court does not indicate what differences in the facts merited this result. Here, Stevens has received the same treatment after filing his state habeas Petition as he received prior to and during the time he applied for that relief. The denial of any form of treatment for his alleged gender identity disorder has remained the same. Also relevant is the fact that in *Thompson*, the State conceded that the second habeas petition was prematurely dismissed.

A.    **Equal Protection - Claim One**

Claim One challenges Stevens' placement by ODOC into a male correctional facility as a denial of his rights, privileges, protections and immunities as a female.  Defendants respond that ODOC's policy of assigning anatomical males to male-only institutions and anatomical females to female-only institutions is substantially related to the achievement of prison security.

Transsexuals are not a suspect class for purposes of the equal protection clause. *Holloway v. Arthur Andersen & Co.,* 566 F2d 659, 663 (9th Cir 1977), *implied overruling on other grounds recognized by Schwenk v. Hartford*, 204 F3d 1187, 1201-02 (9th Cir 2000). Therefore, classifications based upon these grounds must only be "reasonably related to legitimate penological interests."  *Pruitt v. Cheney*, 963 F2d 1160, 1164-66 (9th Cir 1992) (rational basis scrutiny for classifications based upon homosexuality), *cert denied* 506 US 1020 (1992); *Turner v. Safley*, 482 US 78, 89 (1987).  Preventing heterosexual crimes is a legitimate penological interest.  Separating anatomical males and anatomical females into different institutions is reasonably related to achieving this interest.

Even if characterized as a sex based classification, Stevens' equal protection claim fails. Government actions based upon sex are governed by the equal protection clause of the Fourteenth Amendment.  Accordingly, sex based classifications are justified only if substantially related to an important governmental objective, and "a party seeking to uphold government action based on sex must establish an exceedingly persuasive justification for the classification." *U.S. v. Virginia*, 518 US 515, 524 (1996).  However, this standard is not as strict as that which is used to determine whether a race based classification is constitutionally permissible.  *See Wygant v. Jackson Bd. of Ed.*, 476 US 267, 274 (1986).

Defendants argue that ODOC's policy of separating prisoners into institutions based upon their anatomical gender serves the important government objective of maintaining prison security by eliminating the possibility of heterosexual crimes. The policy is substantially related to this interest, they contend, because protection against heterosexual crimes could not be ensured if male and female inmates intermingled in the same prison. Stevens tries to bypass this argument by maintaining that, regardless of the fact that he is anatomically a male, he is nevertheless a transsexual who identifies as a female, and as such, should be placed into an institution with other females.

This court finds that the prevention of heterosexual crime in prisons is a substantial government interest. Although not directly on point, at least one Ninth Circuit case has recognized that prisons may have "*bona fide* reasons for segregation of the genders in prison." *Jeldness v. Pearce*, 30 F3d 1220, 1226 (1994); *see also Klinger v. Dep't of Corr.*, 107 F3d 609, 615 (8th Cir 1997) ("It is beyond controversy that male and female prisoners may lawfully be segregated into separate institutions within a prison system. Gender-based prisoner segregation and segregation based upon prisoners' security levels are common and necessary practices"); *Women Prisoners of Dist. of Columbia Dept. of Corr. v. Dist. of Columbia*, 93 F3d 910, 926 (DC Cir 1996) ("the segregation of inmates by sex is unquestionably constitutional"), citing *Pitts v. Thornburgh*, 866 F2d 1450 (DC Cir 1989).

The separation of sexes based upon anatomical characteristics is substantially related to this interest. Requiring that segregation be made upon a person's self-professed gender identity, rather than their anatomical gender, would impose the onerous burden on prison officials of sorting out those with genuine gender identity issues from those who would feign such a

condition in order to be placed into an opposite sex facility for more nefarious reasons. This could result in increased risk of heterosexual crime. ODOC's policy passes constitutional muster.

With respect to his complaint that prison officials refuse to refer to him with female pronouns and titles, Stevens has failed to raise a legitimate constitutional or statutory basis for his claim. Prison officials have repeatedly stated that they will refer to Stevens using male pronouns because he remains anatomically a male. Stevens has presented no legitimate source of law which would require them to do otherwise. Although he has received a name/gender change from Multnomah County, this court can find no authority for the proposition that this document requires prison officials and staff to refer to Stevens using female pronouns and that their failure to do so violates federal rights cognizable under § 1983.

Even if this court were to construe this as a claim of verbal harassment in violation of the Eighth Amendment prohibition against cruel and unusual punishment, it would fail. As the Ninth Circuit has repeatedly held, verbal harassment alone does not violate the Eighth Amendment. *See Austin v. Terhune*, 367 F3d 1167, 1171 (9th Cir 2004) ("the Eighth Amendmen''s protections do not necessarily extend to mere verbal sexual harassment"), citing *Blueford v. Prunty*, 108 F3d 251, 254-55 (9th Cir 1997) and *Somers v. Thurman*, 109 F3d 614, 624 (9th Cir 1997); *Oltarzewski v. Ruggiero*, 830 F2d 136, 139 (9th Cir 1987) (use of vulgar language toward prisoner not sufficient to establish constitutional deprivation under § 1983).

**B.    Failure to Protect - Claim Three**

Claim Three alleges that defendants have failed to provide Stevens with protective custody despite the fact that he has been threatened by other inmates with assault, rape and death.

To state a claim under the Eighth Amendment for failure to protect, an inmate must prove that his conditions of incarceration pose a substantial risk of serious harm and that the prison official responsible had a "sufficiently culpable state of mind. *Farmer v. Brennen*, 511 US 825, 834 (1994). To satisfy the second requirement, prison officials must be deliberately indifferent to a substantial risk of serious harm to an inmate. *Id* at 828, 835. This is a subjective test requiring an inmate to show that a prison official actually "knows of and disregards an excessive risk to inmate health or safety." *Id* at 839-40. Therefore,

> to survive summary judgment, [a prisoner] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Id* at 846.

Claim Three falters at the first requirement listed in *Farmer*. It is undisputed that Stevens reported to Superintendent Hill that he had received threats of violence, rape and death from inmates while housed in the IMU. In response, Sergeant Miller conducted an immediate investigation. Stevens provided Sergeant Miller with a list of names, many of which were incomplete. Sergeant Miller determined that several of the named individuals were never housed with Stevens and, thus, could not have made the alleged threats. Some of the named inmates were no longer housed at SRCI. In addition to Sergeant Miller's investigation, the SCIEC also

investigated Stevens' complaint and concluded that he did not meet the criteria for placement in the ASU and that transfer to OSP was not possible given documented conflicts at that institution.

Six months later, Sergeant Taylor interviewed Stevens who continued to request placement in the ASU.  However, Stevens offered no names and declined to state the nature of any problems he was having.  After this investigation, the SCIEC again rejected Stevens' request for protective custody.

On this factual record, it is not reasonable to infer that Stevens was or is being exposed to an objectively intolerable risk of harm.  Other than his bald assertion that he has been threatened by a list of names of questionable veracity, Stevens has presented no evidence that he was or is exposed to any risk due to the conditions of his confinement at SRCI.  Stevens need not wait until he is actually assaulted to establish an Eighth Amendment claim.  *See id* at 845. Nonetheless, he must provide some evidence from which a reasonable person could infer that he was or will be exposed to an objectively intolerable risk of harm.  He has failed to do so.

Claim Three also fails the second requirement of the *Farmer* test.  According to the record, SRCI staff were anything but deliberately indifferent towards Stevens.  The uncontested evidence shows that security staff immediately investigated his complaint in compliance with ODOC regulations on two occasions.  In both instances, the evidence revealed no substantial risk to Stevens' health or safety.

Finally, it must be noted that both of these complaints occurred over two years ago. Whatever fear of assault Stevens may have subjectively had in 2005, the record reveals no actual incidents of violence towards Stevens since then.  Furthermore, Stevens has failed to provide any evidence that he remains exposed to an objectively intolerable risk of harm.

Because Stevens has failed to raise a material issue of fact on either prong of the *Farmer* test, defendants' motion should be granted with respect to Claim Three.

## RECOMMENDATION

Stevens has failed to raise a genuine issue of material fact from which a reasonable juror could conclude that any of the defendants have violated his constitutional rights.  Furthermore, Stevens is barred by issue preclusion from relitigating his claim that defendants failed to provide him with adequate medical treatment.  Therefore, defendants' Motion for Summary Judgment (docket # 33) should be GRANTED.

## SCHEDULING ORDER

Because plaintiff is appearing *pro se* and is incarcerated, objections to the Findings and Recommendation, if any, are extended beyond the deadline set forth in FRCP 72(b) to **March 17, 2008**.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

///

///

///

///

## NOTICE

28 - FINDINGS AND RECOMMENDATION

This Findings and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED this 15th day of February, 2008.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge